OPINION
Defendant-appellant Quentin Brown appeals from his conviction and sentence, following a no-contest plea, upon one count of Possession of Crack Cocaine. Brown contends that the trial court erred by denying his motion to suppress evidence, upon the ground that it was obtained as the result of an unlawful stop and arrest, that the trial court erred by accepting his no-contest plea, and that his trial counsel was ineffective.
We conclude that the record fails to demonstrate that Brown's trial counsel was ineffective. We conclude, also, that the trial court properly denied Brown's motion to suppress, because the police officers had a legitimate basis for stopping and arresting him. Finally, we conclude that any error in the taking of Brown's no-contest plea was harmless because, assuming that he believed that his plea was conditioned upon the imposition of a six-year sentence to run concurrently with an existing sentence, that is the sentence that was, in fact, imposed upon him. Furthermore, despite an initial protestation of innocence, upon being informed that the trial court would not accept an Alford plea Brown conferred with his attorney and elected, after consulting counsel, not to contest the State's recitation of the facts of the offense. Accordingly, the judgment of the trial court is Affirmed.
 I
Brown first came to the attention of Dayton police officers Timothy Gould and Rodney Barrett when these officers, who were in a police cruiser, saw Brown driving 55 m.p.h. in a 25 m.p.h. zone. The officers had a radar gun, which was calibrated both before and after their shift, and, using the radar gun, clocked Brown at 55 m.p.h. By the time the reading on the radar gun was "locked in," Brown had slowed to 53 m.p.h. The officers stopped Brown for speeding. In fact, although it was not known to the officers at this time, there were five warrants outstanding for Brown's arrest.
When Brown was asked for his identification, he said that he had no identification. He identified himself as Douglas Gibson. Because Brown had no identification, officers Gould and Barrett had him step out of his car and sit in the back of their police cruiser, evidently intending to verify his identity.
Brown was asked to provide his date of birth, social security number, and address. The date of birth and social security number he provided the officers matched that of Douglas Gibson, but the address did not. Gould then asked Brown, who appeared to Gould to be in his late 20's, to tell them his age. Both police officers testified that it took Brown about twenty seconds to respond to this question, and that he appeared to be counting to himself. Ultimately, he told the officers he was 42, but both police officers testified that Brown's response to this question sounded as though it was, itself, a question.
Gould did not believe that Brown was, in fact, Douglas Gibson. Gould and Barrett arrested Brown for the speeding violation, because Brown was not able to provide satisfactory proof of his identity. It also developed that Douglas Gibson's driver's license had expired, and Brown was arrested for that, as well.
On the way to the jail, which was evidently a short ride of no more than five minutes, both officers testified that they saw Brown moving around quite a bit in the back seat, even though Barrett told Brown to stop. At the jail, a jailer told Gould and Barrett that the person they had brought in was Quentin Brown, and the fingerprints verified this. Brown was then read his rights under Miranda v. Arizona (1966),384 U.S. 436. He indicated that he wanted to consult an attorney, and no questioning ensued. At some point, however, Brown volunteered that he was, in fact, Quentin Brown. It was also at the jail that Gould and Barrett learned, for the first time, that there were five warrants outstanding for Brown's arrest.
When Brown was arrested, after he had failed to produce satisfactory proof of his identity, he was handcuffed. Barrett testified that he, Barrett, had examined the interior of the police cruiser at the beginning of their shift, at about 5:15 p.m. Barrett's examination included a search of the back seat, including up underneath the front seat, for contraband. Brown was arrested at 5:43 p.m., and Barrett testified that no one had been in the back seat of the cruiser between his examination of the back seat at 5:15 p.m. and Brown's arrest at 5:43 p.m. Furthermore, Barrett testified that the cruiser's windows had been rolled up, and that no one had been in a position to place anything in the back seat of the cruiser.
When Barrett opened the door of the cruiser and asked Brown to exit, at the jail, Barrett saw Brown pushing a plastic baggie, which appeared to contain crack cocaine, up underneath the driver's seat, with his foot. Barrett's testimony on this subject on cross-examination is as follows:
 Q. You said you saw him push this Baggie and he was in the driver's side or the passenger side?
A. Driver's side of the rear.
Q. Which foot? Do you recall?
A. Left.
Q. This was at — in the act of getting out of the car?
 A. This is — no, his foot was pushing like up underneath the driver's seat, pushing the Baggie up from under the driver's seat.
 Q. Was the door next to him open or closed at that point?
 A. On — they both were closed. I mean I opened the door and that is when I observed him.
 Q. So you opened the door and saw this pushing motion with his foot?
A. Yes, sir.
Q. And then did you say anything to him at that point?
 A. I asked what are you doing. And that is when he said that is not mine.
Q. And that is when the Miranda thing happened?
 A. Well, I got him — I stepped him out of the car to retrieve the Baggie and then I placed him back into the car to Mirandize him.
Brown was charged with Possession of Crack Cocaine in excess of 25 grams. He moved to suppress the evidence, contending that it was obtained as the result of an unlawful stop, arrest and seizure. Following a hearing, Brown's motion to suppress was denied.
Thereafter, Brown tendered a no-contest plea, which was accepted. The trial court proceeded to sentencing at the same hearing, and imposed a sentence of six years incarceration, to be served concurrently with another six-year sentence, which had been imposed in another case. The mandatory fine was waived upon a representation that Brown was indigent.
From his conviction and sentence, Brown appeals.
 II
Brown's First Assignment of Error is as follows:
 WHETHER THE DEFENDANT'S MOTION TO SUPPRESS SHOULD HAVE BEEN GRANTED BY THE TRIAL COURT AND HAVE THE EVIDENCE REGARDING THE ISSUE OF POSSESSION OF CRACK COCAINE DEEMED INADMISSIBLE BASED ON APPELLANT'S CONSTITUTIONAL RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.
Brown does not appear to be contending that he was improperly stopped. The officers observed what appeared to be a speeding violation, so the stop was proper. Brown appears to be arguing that the stop was improperly prolonged, or transformed, into an arrest.
As the State notes in its brief, the police may not ordinarily arrest someone for a mere traffic violation. However, an arrest is authorized by R.C. 2935.26(A)(2) when the alleged violator does not offer satisfactory evidence of the violator's identity. As we noted in State v. Satterwhite (January 25, 1995), Montgomery App. No. 14699, unreported:
 The purpose of the identification exception in R.C. 2935.26(A)(2) is not to create a requirement that citizens carry and produce "papers" to prove who they are. Rather, its purpose is to afford the citing officer with a means of reasonably insuring himself or herself that a person charged with a violation of law, but who was allowed to proceed on his way, will likely comply with a citation requiring his later court appearance on the charge.
In Satterwhite, we opined:
 This Court perceives the exception to R.C. § 2935.26 to be available to law enforcement when reasonable grounds exist to believe they are being lied to or stone walled in some fashion, not to empower arrested persons without approved government papers.
In the case before us, the testimony of both Officer Gould and Officer Barrett, which the trial court evidently found to be credible, supported a reasonable belief on their part that they were being lied to by Brown when he identified himself as Douglas Gibson. The basis for this belief would be the failure of the address to match the address shown by the computer, Brown's apparent difficulty in telling the officers his age, and the fact that he did not appear to be as old as he claimed. In light of these circumstances, the officers' belief that they were lied to was reasonable.
Additionally, even if Officers Gould and Barrett did not know it at the time they arrested Brown, they had authority to make the arrest pursuant to the outstanding warrants for his arrest. City of Dayton v. Click (October 5, 1994), Montgomery App. No. 14328, unreported.
Brown makes a separate argument, relating to his First Assignment of Error, that the denial of his motion to suppress is against the manifest weight of the evidence at the suppression hearing. The only witnesses who testified at the suppression hearing were Officers Gould and Barrett. We have reviewed the entire transcript of that hearing, and we find nothing inherently incredible in their testimony. As noted, their testimony, if believed, would justify the officers in having arrested Brown, independently of the outstanding warrants for Brown's arrest.
Brown's First Assignment of Error is overruled.
 III
Brown's Second Assignment of Error is as follows:
 WHETHER THE APPELLANT'S CONVICTION BASED UPON HIS NO CONTEST PLEA TO ONE COUNT OF POSSESSION OF CRACK COCAINE IN AN AMOUNT GREATER THAN 25 GRAMS, A FELONY OF THE FIRST DEGREE, PURSUANT TO A PLEA AGREEMENT, AS NEGOTIATED BETWEEN HIS ATTORNEY AND THE STATE'S ATTORNEY CAN BE VACATED DUE TO AN IMPROPER RULING BY THE TRIAL JUDGE WHEN THE DIALOGUE OF THE APPELLANT CLEARLY SHOWS HE DISAGREED WITH SOME IMPORTANT FACTS FOR THE OFFENSE CHARGED AND WHEN THE PLEA WAS NOT MADE KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY.
We have reviewed the entire transcript of the hearing at which Brown's no-contest was tendered and accepted, and at which he was thereafter sentenced. There were only two aspects of this hearing that raise any issues for appeal, and Brown appears to be relying upon both of them.
Initially, when the prosecutor, the late Diane Friday-Brown, was presenting the case to the trial court, she made the following representation:
 It is further agreed that the Defendant would be sentenced to six years, that he would receive credit for any time served, and that the time would run concurrent with a previous case that he was — tha — with a previous case that he's currently doing time on, and I believe that would be Case No. 98-CR-3692. . . .
Mr. GORALESKI [representing Brown]: That's . . .
MS. FRIDAY-BROWN: . . . is that right?
MR. GORALESKI: That's my understanding, Your Honor.
The trial judge then explained to Brown the ramifications of the sentence that might be imposed, and the constitutional rights that he would be waiving by pleading no contest, eliciting from Brown an affirmative response at each step, representing that he understood what the trial judge was saying. The trial judge then made the following remark:
 JUDGE RINGLAND: Now, you understand for the record, sir, that I'm not necessarily bound by agreements of Counsel and recommendations of Counsel, although I generally will follow them. You do understand that, sir?
MR. BROWN: No, I don't.
There then followed several pages of transcript in which the trial judge indicated that he would not be bound by the State's recommendation, and Brown indicated that was contrary to his understanding, and that the assurance that he would receive the concurrent, six-year sentence was essential to his decision to plead no contest. There would be no point in repeating the entirety of that colloquy here, but it is worth setting forth the latter portion thereof:
 MR. BROWN: Yeah, I do apologize, I didn't sign it, but, uh . . . I — it's not that I'm really interested in that, but if I'm not gonna be gettin' that sentence, you know, I'm not sayin' do you — not bound by law to promise me that, but that — but if that's not the sentence that I'm gonna receive, I wouldn't be interested in, you know, pleading. That's all I'm sayin'.
 I don't want to sit here and plead out and then you say somethin' like: "Well, I'm goin' to give you this amount of time and this and this." And it's somethin' other than we all discussed.
 JUDGE RINGLAND: Okay. Well, as I — you know, I can say no more than I've already said. I generally will follow the recommendations of the State and the agreements of Counsel, but no one can bind me to it. That's all I'm saying.
MR. GORALESKI: He's telling you what the law is.
 JUDGE RINGLAND: So if you don't want to follow that, if that causes you problems, then we'll just go ahead and tee this one up.
MR. BROWN: Will this not cause any problems?
 JUDGE RINGLAND: Well, I'm just saying if it causes you any — any concerns then — then certainly I can — I can understand that and we'll just go ahead and set it for trial.
 MR. GORALESKI: You — you're comfortable going forward right now?
MR. BROWN: Yeah.
MR. GORALESKI: Okay.
 JUDGE RINGLAND: Okay. Let me ask you some other questions, sir. At this point in time, have you taken any medication within the last twenty-four hours?
Thereafter, the issue of whether the trial court would be bound to impose a six-year, concurrent sentence was not again discussed.
Brown seems to be arguing, in part, that there was never a meeting of the minds, because he never understood that in pleading no contest he would be subject to the possibility that the trial court might impose a sentence other than the six-year, concurrent sentence that Brown and the State had agreed to. We are inclined to agree with Brown that it is not clear from the record that he ever relinquished his understanding that he could count on receiving the six-year, concurrent sentence to which he and the State agreed. However, we can find no prejudice to Brown, because that is, in fact, the sentence that he received. In other words, his erroneous belief, if that is what he truly believed, that the trial court would be bound to impose the six-year, concurrent sentence, was in no way detrimental to him, since he received the sentence that he erroneously believed had been promised.
The next issue concerning the no-contest plea arose after the prosecutor had, at the trial court's request, recited the facts and circumstances of the alleged offense. What happened thereafter is worth setting forth in full:
 JUDGE RINGLAND: Anything you want to add or change to the facts, Counsel?
MR. GORALESKI: Uh . . . no, Your Honor.
 JUDGE RINGLAND: Sir, anything you want to add or change to what the Prosecutor has told me, sir?
 MR. BROWN: I mean, would it be anything that I would be able to say to make a difference?
 JUDGE RINGLAND: Anything you just want — I — I'm going to ask you first of all if you want to add anything or change anything what she told me and then I'm going to ask you if you have disagreement with the facts.
 MR. BROWN: Well, I have disagreements, but I want — I'm not really goin' to sit here make any parties upset wit' me or mad because what I might say or what I might present. So yes, I have some disagreements, but they're not gonna make any difference in — she stated the facts as she feel they are facts, so I just feel like I might just really keep it to myself.
 JUDGE RINGLAND: Can you tell me what you disagree with?
 MR. BROWN: Well, I — I disagree with what the police are alleging is — is, you know, is — first of all, I — I — I wouldn't want to flat out bluntly say what I wanna say, but disagreeing and sayin' what he saw me doin' and what he sa — what he said he saw me doin' is — is not at all what took place.
 And I — and — and, you know, that's basically all I have to say. And, you know, he got me out of the car while I was handcuffed. He patted me down, never found any drugs on me. He took my cell phone off of me and set it back in the truck, patted me down, and when I was in the back of the cruiser, I was never out of the sight — it was two officers. And when he gets downtown, he comes out with a bag of crack from up under this front seat, while I've been in the back handcuffed. And he patted me down and never found any crack on me, never felt any crack on me. The objects he felt on me, he had took `em and placed in his possession, which was cash, uh . . . and a cell phone, and that was it.
JUDGE RINGLAND: You . . .
 MR. BROWN: But all — all I have to say is that what he's sayin' about that, which allegedly police are humans just like I am human, and police are regular people like I'm a regular person, and all the times police don't tell the truth.
 So what I am sayin', I was pulled over, I pulled over without incident, I talked to the police, I had no problem going back to their car, cooperated with the police. But what he's alleging as far as that, that — that did not never take place, what he's sayin' he observed me kickin' a motion — kickin' a bag up under his seat.
 JUDGE RINGLAND: So you're saying the crack that was found is not — was not obtained, possessed, or . . .
 MR. BROWN: That's — that's — that's — what I'm sayin'. And at the same time that I'm sayin' that — at the same time that I'm sayin' that, like I said, it wouldn't make any difference for me to say this, but I feel like since you asked me I would say it and put it on the record.
 JUDGE RINGLAND: Well, it makes a difference to me, because if you're not — if you're an innocent man, I'm not going . . .
MR. BROWN: So . . .
 JUDGE RINGLAND: . . . I'm not going to find an innocent man guilty.
 MR. BROWN: Well, basically what it boils down to is, uh. . . . if I — if I go to trial and then I get found guilty by some Jurors, or per se by a Judge . . .
JUDGE RINGLAND: I understand . . .
 MR. BROWN: . . . I can be innocent. Ha — have you seen innocent people that have been presumed to be found guilty?
 JUDGE RINGLAND: I don't take — I don't take alpha [sic, presumably Alford was intended] pleas. Alpha pleas are pleas for convenience sake. If a man's not guilty, then I don't want to have a man found guilty and — and go up because he may be innocent. I'll give you time to prove your case, or at least to make the State prove it because I think if you're an innocent man, I'm not going to sit here and find you guilty and send you up.
MR. BROWN: Well . . .
 JUDGE RINGLAND: So I'm not — I'm not going to accept the plea, if — if that's the case.
MR. BROWN: . . . would it be — would it be. . . .
 MR. GORALESKI: Uh . . . I need to speak with him briefly.
 JUDGE RINGLAND: That's fine. If you want to take — if you want to talk to him a few minutes, that's fine, we'll give you a chance to do that.
MR. GORALESKI: Okay.
[Pause in Proceedings]
 JUDGE RINGLAND: Have you talked to your client, Counsel?
 MR. GORALESKI: Yes, Your Honor. I — I, uh . . . talked with Mr. Brown and explained, uh . . . the nature of this process and — and what a No Contest Plea is. And I believed he is prepared at this time to, uh . . . to let the facts stand as stated by, uh . . . Ms. Brown.
Is that — is that correct, Mr. Brown?
MR. BROWN: Yes, sir.
 JUDGE RINGLAND: All right. Again, I'll ask you if there's anything else that you want to add or change?
MR. BROWN: No, sir.
 JUDGE RINGLAND: All right. Do you still wish to enter a No Contest Plea then, sir?
MR. BROWN: Yes, sir.
Brown argues, in his brief, that the trial court abused its discretion by accepting his no-contest plea under these circumstances. We conclude that Brown has not demonstrated any abuse of discretion. Brown was represented at the plea hearing by competent counsel, and the record reflects that Brown was afforded an opportunity to consult with counsel when he discovered that the trial court was not inclined to accept a plea accompanied by a protestation of innocence, as provided for in North Carolina v. Alford (1970), 400 U.S. 25. We must presume, in the face of a silent record, that Brown's trial counsel gave him appropriate advice concerning the likely outcome of a trial. Based upon our review of the evidence presented at the suppression hearing, it is apparent that a jury would have had to have disbelieved Officer Barrett, assuming that his testimony would be the same at trial, in order to find Brown not guilty of the charge. Admittedly, this assumes that the substance in the plastic baggie was crack cocaine, but there is nothing in the record to suggest otherwise, and these proceedings would likely have taken a very different course, with a different outcome, if the substance in the plastic baggie was not chemically determined to have been crack cocaine.
Based upon our review of this record, we conclude that it was rational for Brown to enter a no-contest plea, even if he believed himself to be innocent of the charge, in view of the likelihood of conviction and the possibility that upon conviction he would receive a significantly more onerous sentence. Accordingly, we find no abuse of discretion on the part of the trial court in accepting the no-contest plea, given the circumstances apparent from this record.
Brown's Second Assignment of Error is overruled.
 IV
Brown's Third Assignment of Error is as follows:
 WHETHER THE APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL SO AS TO INDUCE HIM TO ENTER A NO CONTEST PLEA, CAUSE HIM TO BE CONVICTED AND SENTENCED, FAIL TO ADVOCATE EFFECTIVELY FOR HIM, AND THEREBY VIOLATE DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO STATE CONSTITUTION.
As with any other error urged on direct appeal, a claim of ineffective assistance of trial counsel must be made to appear from the record. Brown argues that the record establishes that he was confused about the nature of the plea bargain, as well as the effect of his no-contest plea upon the trial court's adjudication of his guilt or innocence. He points to the places in the transcript that have been referred to in Part III, above. The transcript of the plea proceeding does indicate that Brown was confused, at the hearing, concerning the nature of the plea bargain, and that he believed he had been promised a particular sentence, which would be binding upon the trial court upon the acceptance of his plea. However, the record reflects that there was a pause in the proceedings while Brown discussed this subject with his counsel. We cannot determine, from the transcript, whether this confusion was cleared up as a result of that conference. There is no affirmative indication that the confusion persisted thereafter, and, in the face of a silent record, we must assume that during the off-the-record conference with his trial counsel, Brown received accurate and appropriate advice. More importantly, even if Brown had been suffering from the mistaken belief that the trial court would be bound to impose the six-year, concurrent sentence that was apparently crucial to his decision to plead no contest, that is, in fact, the sentence that was imposed. Therefore, even if Brown was misled on this subject, as the result of the ineffective assistance of his trial counsel, he was not prejudiced thereby, since he in fact received the sentence that he thought had been promised him.
With respect to possible confusion about the effect of the no-contest plea on the trial court's adjudication of Brown's guilt or innocence, again, the record reflects that there was an off-the-record conference between Brown and his trial counsel during the proceedings, and there is nothing in the record to suggest that the advice he received during that off-the-record conference was anything other than accurate and appropriate. Indeed, the inescapable conclusion that one derives from reading the entire transcript of the plea and sentencing proceeding is that Brown's essential purpose was to obtain a six-year sentence that would run concurrently with a sentence that had recently been imposed upon him in another case. Otherwise, he could have received up to a ten-year sentence, to be served consecutively with the sentence in the other case. The concurrent, six-year sentence was Brown's objective, and, with the assistance of his trial counsel, he attained that objective. There is nothing on the face of this record to demonstrate that his trial counsel was ineffective, or that Brown was prejudiced as a result.
Brown's Third Assignment of Error is overruled.
 V
All of Brown's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and GRADY, JJ., concur.